## AFFIDAVIT OF SHARON HUBER

I, Sharon Huber, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am currently assigned to the Violent Crime Task Force investigating, among other things, drug and drug-related crimes in the Lawrence, Massachusetts area.

2. I have been a special agent with the FBI since October of 2002. Prior to joining the FBI, I was employed as a special agent with the United States Capitol Police for approximately seven years.

3. I am submitting this affidavit in support of an application for a criminal complaint charging **LUIS COLON, JR.** with attempted theft of government property having a value in excess of $1000 in violation of Title 18, United States Code, Section 641.

4. This affidavit is submitted for the limited purpose of establishing probable cause to believe that **COLON** has committed the above-described offense. Accordingly, I have not included each and every fact known to myself and other law enforcement officers involved in this investigation.

5. For the past five months, I have been assigned to a multi-agency investigation of the Dome Dwellers, a violent street gang operating in Lawrence, Massachusetts. Over the course of

this investigation, law enforcement agents assigned to the Essex County Gang Task Force ("the Task Force") have made numerous purchases of controlled substances and firearms from members or associates of the Dome Dwellers or their drug suppliers using various confidential informants and cooperating witnesses.

6. The investigation of the Dome Dwellers resulted in the arrest of four individuals on a variety of federal gun and drug charges on January 20, 2004. The individuals arrested included JOSE RODRIGUEZ, A/K/A "CABLE," of Lawrence. RODRIGUEZ was charged with drug distribution based on sales of heroin that he made to a cooperating witness.

7. Shortly before RODRIGUEZ' arrest, **COLON** approached a Lawrence police detective and indicated that he wished to cooperate with law enforcement. Among other things, he stated that he was a longstanding drug customer of RODRIGUEZ and could provide information about RODRIGUEZ and his organization. Because RODRIGUEZ was a target of the FBI's investigation of the Dome Dwellers, he was referred to me and other members of the Task Force.

8. I debriefed **COLON** with other members of the Task Force on January 15, 2004. Among other things, **COLON** stated that he had sold heroin and crack cocaine for many years for RODRIGUEZ and his partner, CARLITO LNU, who was subsequently identified as CARLOS LABOY. **COLON** also advised that he owed RODRIGUEZ $2,400 for heroin and that he believed that LABOY would provide him with

additional drugs if that debt was repaid.

9. As set forth above, RODRIGUEZ was arrested several days following this debriefing. After RODRIGUEZ's arrest, **COLON** reported that LABOY had contacted him seeking the money **COLON** owed him and RODRIGUEZ in order to bail RODRIGUEZ out of jail. **COLON** reiterated that, if his debt to RODRIGUEZ and LABOY was paid off, he believed he would be able to obtain heroin from LABOY.

10. Based on this information, we decided to open **COLON** up as a cooperating witness and to pay off a portion of **COLON**'s debt in order to make drug purchases from LABOY. In fact, **COLON** made consensually recorded telephone calls to LABOY regarding the debt and met with LABOY on January 28, 2004 and paid him $1200 of the debt with official government currency that was provided by the FBI in the hope that LABOY would allow **COLON** to work off the balance of the debt by providing **COLON** with drugs to sell.

11. Notwithstanding this partial payment, LABOY did not provide **COLON** with any drugs. Accordingly, a decision was made on or about February 4, 2004 to pay off the balance of **COLON**'s alleged debt in the hope that LABOY would then be willing to sell **COLON** drugs.

12. Agents met with **COLON** at approximately 7:00p.m. on February 4, 2004 and directed him to place a consensually

recorded telephone call to LABOY.[1] That call was placed at 7:14 and took place in Spanish. While the call was going on, agents noticed that **COLON** was walking away so as to put the conversation out of earshot of Lawrence Police Detective Richard Brooks, who speaks Spanish.

13. After **COLON** got off the phone, he reported that he told LABOY that he had the balance of the money he owed him and asked if LABOY would have any "work" for him once the debt was paid. **COLON** reported that LABOY was willing to provide **COLON** with crack cocaine and heroin and requested that he call him back when **COLON** wanted to meet.

14. Based on **COLON**'s version of the call, we instructed **COLON** to call LABOY back to set up a meeting. **COLON** tried with no success. **COLON** then stated he knew that LABOY was hanging out near Haverhill and Broadway Streets in Lawrence and suggested that he go there to see if he could do the deal.

15. We agreed and provided **COLON** with recording equipment, a transmitter, and $1200 in official government currency for LABOY. We then followed **COLON** as he drove to the intersection of

---

[1] At the outset of the meeting, agents noticed that **COLON** was acting strangely and asked him if he was under the influence of any illegal drug. **COLON** said he had taken some medicine for a blood clot and that he was fully able to proceed with the proposed meeting. Over the course of the next 90 minutes, during which **COLON** spoke with LABOY on the telephone, drove his car and walked to various locations and talked to me and the other agents about the meeting and the missing money, **COLON** was alert and appeared fully aware of what he was doing.

Franklin and Haverhill Street in Lawrence and parked his car.

16. After **COLON** parked his car, agents surveilled him as he walked down Haverhill Street. Special Agent Jeff Wood noted that **COLON** appeared to be grabbing his buttocks with his right hand as if he was manipulating something in his posterior region.

17. **COLON** went to several locations in an effort to locate LABOY but did not find him. **COLON** also attempted to call LABOY without apparent success. At approximately 8:20p.m., **COLON** was instructed to return to a meeting location because it did not appear that LABOY was in the area.

18. Once back at the meeting location, **COLON** gave agents the recording equipment and the transmitter. When asked for the $1200 in official government currency, however, **COLON** stated that he did not have it and showed agents a large hole in his back pocket. When agents opened the door to **COLON**'s car to see if the money was there, they found no money but did see a hypodermic needle containing brown residue fall to the street.

19. **COLON** repeatedly denied knowing where the money was. When agents confronted **COLON** with their suspicions that he may have taken the money, **COLON** invited them to search him.

20. Agents accepted **COLON**'s offer and took him to a separate room to search him. Once inside, they asked **COLON** to remove his pants and saw currency sticking out of his rectum. **COLON** was asked to remove the money and he took it from his anal

area and threw it to the ground.  All $1200 was recovered.

21.  After the money was recovered, **COLON** admitted that he had lied to the agents and stated that he had taken the $1200 to buy heroin.  He also admitted to using heroin that morning.

22.  Based on the forgoing, I believe there is probable cause to believe that, on February 4, 2004, **LUIS COLON, JR.** attempted to steal government property having a value in excess of $1000 in violation of Title 18, United States Code, Section 641.

Signed under the pains and penalties of perjury this 2 day of March, 2004.

*(signature)*
SHARON HUBER
Special Agent, FBI

Sworn to and subscribed before me this 2/ day of March, 2004

*(signature)*
MAGISTRATE JUDGE JUDITH G. DEIN